That leads to our final case for this morning, 24-2191 Top Brand v. Cozy Comfort. Okay, Mr. Castanhas. Thank you. Good morning. Thanks to all your honors, and may it please the Court. The multiple Rule 28J letters that Cozy Comfort has submitted over the last several days serve to demonstrate the importance of the principal issue in this case, the scope of Cozy Comfort's design patent claim. I intend to focus my attention today on three issues. One, JMOL of no design patent infringement. Two, and that's, by the way, because of the legally limited scope of that claim. Two, JMOL of no trademark infringement. And three, the district court's refusal to grant a new trial in the face of this court's LKQ decision, which made the obviousness instruction in this case prejudicially erroneous. Let me start with JMOL of no design patent infringement. Cozy Comfort got the 788 patent by overcoming an anticipation rejection in convincing the examiner that, and I quote, small differences like the size and location of its marsupial pockets, those are the pockets in the front of a sweatshirt, like a kangaroo, and the backward angle of its bottom hem were going to be important to the ordinary observer. It had to do this because oversized hoodie sweatshirts were ubiquitous. The white 900 patent was just one of many examples that existed in the art. By making these narrowing representations, Cozy Comfort traversed the anticipation rejection and also avoided any obviousness consideration of its design. The court should keep that fact in mind when it considers that the 788 patent was also never tested for obviousness under the current LKQ standard. But by the time of trial, Cozy Comfort was telling an entirely different story. It was telling the story through its expert that the shopper, and I quote here, the shopper would not go into so much great detail in figuring out features and things like that. They would actually just pull up the product online and click and buy. That's Mr. Crumley's testimony at Appendix 24583. And what did Cozy Comfort get for this change in position, for this manipulation of its so-called nose of wax? It got an enormous judgment against Top Brand on this theory despite the fact that the accused hoodies manufactured by our client lack all of the things. The narrow and high pocket. I assume that I agree with you for the sake of argument on the claim construction position and that the district court should have adopted the words that you wanted. Why is there not a fact dispute at that point and I should remand for a trial at which a new jury would be read your long but accurate, I think, probably claim construction? The simple answer, Judge Stark, is that they've never challenged. And we've put them to that challenge on this appeal. They've conceded they cannot show infringement under your construction. They have never shown any evidence that under our construction. And in fact, Judge Stark, let's take a look at what those representations were and we can show you why that's the case. The pocket size representation. This is at Appendix 15108. And by the way, these are all in our verbal construction that was originally offered at 5274 of the appendix. So you're telling us 15108? 15108. This is the file history now. This is the what? The file history. So 15108, the applicant says, the pocket in the inventive design is approximately one-third of the width of the torso. Okay? Start there. The evidence at trial, undisputed, is that the pockets in the accused designs of our client span approximately two-thirds the width of the torso. Now, if you look at this court's cases, this court's decisions in cases like Elmer, in cases like, there are two others that we've cited in our brief as well that also either grant or affirm judgment as a matter of law on appeal. They're cited in tandem with our Elmer decision. They're out of the Federalist Code. But Elmer is precedential. This court does that all the time. It looks itself and says, in ordinary, no reasonable jury, no reasonable finder of fact could find this. And let's go on to their second representation, which is the location of the pockets. They say, in the enlarged overgarment, this is at 15109, Judge Rina. In the enlarged overgarment, by contrast, the bottom of the armscye, that's a term I learned for this case, it's an armhole, is actually below the top of the marsupial pocket. Well, you can look at the illustrations in the appendix and see that in all but one of our designs, in only one of our limited designs, the arm, the pocket is below. So it doesn't meet that either. Then finally, and this is really, I think, the easiest way, look at 15110. The angle of the bottom hem is different. What do they say about that? In the inventive design. This couldn't have been clearer if they'd written in their specification in a utility patent, my invention is. In the inventive design, the bottom hem slopes downward. No dispute whatsoever. So what you're saying is that if any of these features is different in the accused design, then there's no infringement, just that one, taking one feature at a time? I don't have to do that here, and I don't think that's even necessary because this is where I'm going to wind up here, which is also at 15110. This is what the applicant said. There are, in fact, significant differences that an ordinary observer would see, appreciate, and rely on to distinguish the two designs. These differences are not trivial. The slope of the bottom hem is significant. The proportions of the arm size to the marsupial products are markedly different. And the many differences in the marsupial pockets are prominent because of their frontal location on the torso of each design. That's how they summed it up. These three things were what mattered. And all three of those things are absent from our product. So we don't have to do the one-by-one. The combination prevents an ordinary observer. Absolutely. Absolutely. And the simple fact is, as I said, that no reasonable jury could conclude that these accused sweatshirts. They lack all of these features. They could not conclude that there was infringement. That's why judgment as a matter of law should be granted here. I think, by the way, we've ventilated exhaustively through letters their waiver argument. Unless the Court has questions on that, let me move to trademark because I think it's important to walk through what they say is the sufficient substantial evidence of trademark infringement. Okay? My friends say that four pieces of evidence demonstrate substantial evidence to support the trademark verdict. And they say this at the bottom of page 40 of the red brief. The first piece of evidence they cite is in appendix 2492. That's the webpage that has the pull-down menu that says comfy. We don't know what that goes to. There's no evidence of what happened once you clicked on that. That's all the evidence. Well, they say it took you to an Amazon webpage. There's no evidence of that. They say that. I'm not sure. Well, let's put that to the side. Okay. I'm sorry. There is some testimony to that effect, I thought. There is some testimony from Mr. Negan that those menu items were to take you to an Amazon webpage. What Amazon webpage? We don't know. We don't know. They didn't show us what that webpage was. They just used Mr. Negan's testimony, which, by the way, was elicited on direct just to explain why that was there. Does it matter that we know which Amazon webpage? No, I'm just trying to explain to you how thin the evidence is here because then their second piece of evidence is Mr. Negan's testimony explaining the pull-down menu. He says it means it's comfy, it's comfortable, it's snuggy. The third piece of evidence, and this is where they really lean, and that's on an Amazon webpage that they've printed out, 2469 to 2477. Let me take you to 2477 because they say that there are customer questions and answers at 2477 that show likely confusion. Now, first I want to point – should I wait until you find that page? Go ahead. Okay. At 2477, I want to point out that this is an Amazon Terinia webpage. That's a different product line than the Catalonia product line, Judge Reyna, that was the subject of the pull-down menu. And this is a page that has customer questions and answers. Now, here's what's important to note about those questions and answers. Those questions and answers were posted on February 29th and March 1st of the year 2020. I think I have the wrong page. I'm sorry. 20477. 20477. I'm sorry if I misspoke. Go ahead. Sorry. I want to make sure that you're there because I think it's really important to see this. As I said, this is an Amazon Terinia webpage, and these are customer comments, customer questions, and customer answers. Now, first of all, I want to point out that on page 46 of the red brief, my friend told this court that, quote, Top Brand told customers that Top Brand's product was the real brand, Comfy. Well, that wasn't Top Brand speaking at all. That was a customer. It was a customer question, not even an answer. At best, one of the four answers suggested that a consumer was confused, but confused about what? Confused about the use of Comfy on the Catalonia website? No. First of all, this is a Terinia website. Second of all, when did Comfy appear on the Catalonia website? 2021. This could not have had anything to do with the limited use of the Comfy on the pull-down menu. Back up a moment here. Suppose that your client had said, our brand is Comfy Brand, and they had used that terminology, and that, of course, wouldn't be registrable as a federal trademark because it would be descriptive, but they go around and they say Comfy Brand blankets. That could create a likelihood of confusion with the Comfy, correct? I think it's possible, of course. I'm always hesitant to say that's not this case because you're asking me a hypothetical, but the difference is important here. So that could possibly create a likelihood of confusion. I guess the argument is that the use of the word Comfy in your client's website might be read to suggest not the quality or the characteristic of the product, but the name of the product. It might be. Where's the survey evidence that shows that? Where is the expert testimony that shows that? It wasn't there. They put up this thing and said, we get to use the word Comfy. They don't. That was their theory of the case. And their last, by the way, their last piece, okay. I'm not sure that they have to have survey evidence or expert testimony. Why is the jury not entitled to look at the drop-down menu and say, hmm, they're using the word Comfy as the brand for their product? On this record, no, because if you look in the context, the pull-down menu says Comfy, and then it says Snuggly right below. These are descriptors. And that's what Mr. Negan testified to. Was there any testimony to the contrary, that a consumer was confused? A single consumer was confused by that? No. We don't let the jury speculate on such things in trademark cases. In trademark cases, we ask for the jury to be guided with actual evidence. What we have here is lawyer speculation, and that's all we have. Those four pieces of evidence, that's it. They didn't even put on expert evidence on this. Trade dress evidence, sure, but they lost their trade dress case. Trademark expert evidence, none of it. What was their trademark damages that their expert calculated? $3,000 in revenues attributable to the trademark. $3,000 in revenues. They got two $1.54 million awards for trademark infringement. Is that an arguable weakness of their mark? Is that a factor in the infringement analysis? It might be a factor, but we don't have to get there in that case because of the total lack of any evidence in this case. And on obviousness, I know you're running out of time. My time is yours. If we were to order that the district court grant a judgment as a matter of law of no infringement on the design patent, are you still pressing your obviousness claim? I think we'd be happy to. If we got a judgment of non-infringement in this case, we're not intending to sow salt into their fields. We just want to win this case and be able to compete not in the courtroom but in the marketplace. We don't have much time, hardly any, but can you make a brief comment on damages here? Yes. Which aspect of it? The trademark. The trademark damages themselves. Where did the juror get two $1.54 million damage awards for each of the alleged infringements of the two V. Comfey trademarks? It's exactly, to the penny, 10% of their design patent award. It's double recovery. It's not supported by the evidence at all in this case, and even if there were any trademark liability. And that's why I started there, because I think you can take care of this issue by just saying no liability, no liability. But if you start there, if you get past the liability issue, then there is absolutely no evidence. In fact, look at their closing. Look at their expert. You will not find any calculated evidence of trademark damages. The only thing you'll see is an argument made whole cloth, frankly, by my friend's trial counsel saying every one of our sales was somehow attributable to that pull-down menu, and so they should get $66 million. That's not right. Thank you. I hope I'll have a little bit of time on rebuttal if need be. We'll give you three minutes, sir. Ms. Wilbert. May it please the Court. Johanna Wilbert representing Cozy Comfort. Turning first to the claim construction issue. This issue is waived. Power integration explains that when a district court has not finally addressed a claim construction issue, it is incumbent on the party that does not agree with the district court's claim construction order to raise that issue before it is submitted to the jury. Let's assume for the moment that we don't accept that. Do you agree that the statements that were made in the course of the prosecution constituted a disclaimer, or if not, why not? No. Cozy Comfort's statement do not rise to the level of a clear disavowal. Cozy Comfort differentiated that its enlarged, whole-body blanket was different than the white sweatshirt, arguing that the designs were not substantially the same design, due in part to the grossly exaggerated size as a whole-body blanket. It's very important that we look at Appendix 15107 through 15107 through 151010. Top Brand has cherry-picked some individual statements, but when it is read in the context of its argument, it opens at the top, making the point that it is the overall design that is different. Then the office action describes the pictures of the claim, and again concludes, after talking about the collective differences, that for all of the above reasons, applicant submits the two designs are not substantially the same. So here, when you think about the policy and the difference between utility patents and design patents, for design patents, when a party generally distinguishes prior art without a specific statement that rises to the level of disavowal, these key distinctions are actually captured in the infringement and the anticipation analysis, because an ordinary observer is deemed to be knowledgeable of the prior art. It seems like the implication of your argument, though, is that there can't be prosecution history estoppel for a design patent unless you amend the figures. Is that what you're saying? No, that's not what I'm saying. I'm trying to distinguish this office action from what existed in the Nike v. Sketchers case. That's an example where there was clear disavowal, and that's an example where Nike, in the context of an IPR, said a critical element... Your friend on the other side took us through three very clear instances where the applicant here said, these are significant differences, and this is our invention. This is why we are not white. Doesn't that have to have some impact on claim scope when you're that clear in making a statement that leads to patentability? The reason it's not as clear as Top Brand is arguing is because those were verbal descriptions of the figures that were examples to the higher point, that the overall design is very different because of the gross proportions. But even though I don't agree that there was clear disavowal, if there was, Pacific Coast Marine is very instructive that even if there was disavowal, there is clear evidence supporting infringement, because Pacific Coast Marine explains that the range concept from utility patents doesn't apply to design patent context. So in that case, there was a boat windshield with a four-hole vent design, and that party canceled claims for a two-hole design. And there was a finding of infringement for a boat with three-hole designs. And Pacific Coast Marine says that the concept of ranges doesn't apply in the same way, so that by canceling the claims for the two-hole design, the party did not give up the range between zero and four. Let me give you a hypothetical, see if I can understand this. Suppose during prosecution the applicant said, I'm distinguishing this piece of prior art because that piece of prior art has a round pocket and we have a square pocket. And shouldn't the jury be told that the claim design under those circumstances includes a square pocket? In your hypothetical, is that the only distinction made? Then, yes. If that's the only distinction made, I think that gets us closer to the Nike versus Skechers case. Why are the distinctions here not like that, where they say, this is different from white because our pocket is further down the hood or whatever, further down the garment? It's different because this office action starts out talking about the total, all of the ornamental features combined together to give this claim design, which is a big, wearable, whole-body blanket. It's a whole-body blanket, which it distinguishes from the sweatshirt design. And it doesn't distinguish it, in your hypothetical you only said, well, what if we distinguish on this one feature? This distinction was on the totality of all these elements combined that give an ornamental appearance that a substantial observer would be able to see. So we have to have words when responding to office actions, otherwise it would just be pictures moving back and forth. And the premise here is that they're not substantially the same because of the grossly exaggerated size. That's the first paragraph. Then every element that they distinguish is explaining their figures and concluding with the idea that all of these elements come together to make a different invention. This would almost be like saying if you have a patent on a car with four wheels, why a bicycle with two wheels is different. I don't see that their proposed construction is precluding an overall evaluation. They're not saying because the pocket is a particular shape, the jury has to find that there's no infringement. It's saying this is how we construe the claim as having these particular features, which were emphasized in the prosecution history is distinguishing this from white. So what's wrong with that? As an instruction that seems fairly consistent with what happened in the prosecution history. It's not saying don't make an overall determination, make an individualized determination. So what's wrong with that is really Croc's warning of how the dangers of reliance on verbal claim construction. When you're looking at design patents, the pictures can be the best, but even if you adopt a different claim construction here, it's important to realize that the judge allowed in evidence of white and all of the discussion about the prosecution history. So there's a matter of claim scope. That's a question of law that shouldn't be argued in front of the jury. It was not being argued in front of the jury. I understand, but I just don't see where it gets you. If we think that you disclaim claim scope, the jury has to be instructed of that in some way as a question of law. We can't leave it to them to decide if you disclaim claim scope. Well, here the infringement test takes into account prior art. And the white reference here is just another piece of prior art. Do you argue that you could prove infringement under the construction that was proposed but rejected by the district court? Absolutely. One of Top Brand's designs is actually almost identical to Cozy's patent. There is a significant range of designs. I'm so sorry, I don't have that number. We can follow up, but there were a number of different designs. You've got to be able to substantiate it by looking at the record and showing us. You're very trustworthy, but that doesn't mean we don't want to see it. It was the first design discussed at the trial record below. I don't have that site for you. I apologize. But there is a significant range between the white design and the Top Brand design. And because the Top Brand design is not identical to the white design, there still is evidence to prove infringement. There's actually a very clear record that supports a finding of infringement. If you look at the evidence of Cozy Comfort's garment design expert, Mr. Crumbly, he discusses how he compared the patent to designed physical samples and how there are similarities. That's at appendix 24754 through 24757. His testimony continues through 24581 and talks about the similarities. The problem we have is that we've said repeatedly that design patents have very limited scope. And comparing these things in the light of the disclaimers that were made, the accused product seems to be different. The accused product is different than the white design? No, different from the patent design. Your Honor, with due respect, it appears that they are nearly identical based on... Maybe you can't do it, but show me an example that shows the similarity in the light of the finding structure. Well, Cozy Comfort submitted testimony of its expert witness that went through and compared element by element. So reviewing that testimony would be the reason why the record supports a finding of infringement, even if there is this claim construction argument. Turning to the trademark issue, you questioned whether... The question was raised as to where this redirect goes and the evidence in. Page 10 of the red brief explains that the Comfy website links were redirected to the Amazon store, and that's based on Nahn's testimony. In your view, which Amazon website was it directed to? Can you show us in the record the Amazon website? As we understand, there is only one Amazon website. Sure. Appendix 23799 at lines 2 through 11. This is testimony. It's not the actual website. Correct. The website was an exhibit. Okay, so the website is the exhibit at... 2467? I'm sorry. 20492 shows the website. Then Mr. Nahn gave... 20492. That's your website. The Catalonia website? That's your website, right? I thought we were talking about the Amazon website. Well, that website redirects to the Amazon... But I want you to look at the Amazon website to which you say it redirects. There's testimony that it redirects. I don't know where. I want to look at the Amazon website. I want to look at what it shows. So the Amazon website is... Isn't that at 20469? Isn't that the Amazon website? There are some Amazon comments, and yes, that is... So if you look at it, the top brand product isn't described in this website as comfy. The only descriptions are of your client's product, the comfy. There's no use of the word comfy to describe their product, right? No, that's not correct. At the bottom, there are comments, and it's appendix 24430. Let's put aside the comments for a moment. They don't use the word comfy to describe their product, right? The Amazon website does not, but the company's website redirects to the Amazon website, and the sales from the company's website... Okay, but the Amazon website doesn't describe their product as comfy. I ask you to put aside the comments. The website, apart from the comments, does not describe their product as comfy, right? Correct. Okay, and it distinguishes, it shows the comfy for other products, right? In the comments. The words the comfy are used in the comments. Okay. Just in the website itself, there's no use by them of comfy to describe their product, and it shows your client's product as the comfy, right? No likelihood of confusion based on the website. Putting aside the comments, right? Based just on the website, without the comments? No, no, I'm talking about in the Amazon website. There's no confusion. It doesn't create any confusion between the two products, right? The comments are an implicit part of the website. It's part of the website. I'm sorry, you've got to accept my hypothetical, okay? Put aside the comments. There's nothing in the website that would create a confusion between their product and your product. We disagree because there's evidence of actual confusion. Customers contacted my client because they were confused. That's also in the record. You're not accepting my hypothetical. Just looking at the website itself, there's no possible confusion between their product and your product, right? Only if you would accept that the comments are not part of the website, which I think is a fundamental flaw of the premise of the hypothetical. So why did the comments create the confusion? The comments create confusion because the company allowed them to stay up, and the companies used the trademark, The Comfy. There are questions asking, is this the brand Comfy? Do they control the comments? They can. That's why comments don't have... What's the evidence of that? Is there evidence in the record that the company controls the comments? It's a function of how websites work. I don't happen to know that. Even if we move on, Your Honor, I'm sorry, I'm out of time. Is there evidence that the company is responsible for the comments? There may well be, I just don't know. Non-testified that they have one Amazon page, that his company controls that Amazon page, and testified that their website redirects the Amazon page, and then there was evidence of sales. Where does he testify they control the Amazon page? He says that it redirects the Amazon store page at appendix 23772 through 23773. Looking at the page number that you cited to us, I looked at some of the following pages, and I recall that at the very top there's a legend of the next five pages, and it's got pictures of the Comfy and everything, and at the top it says Amazon.com, oversized hoodies, blankets, sweatshirt, comfortable shirt, pajama, and it goes on. And then it's got the comments about this. Is this legend, Amazon.com, is that on the webpage itself? Are these actual copies of the webpage? Yes, Your Honor. So every one of these pages does say Amazon.com at the top? Yes, that's an actual printout. When it appears on the computer, it appears in a different format, but that's the printout. And the point here about the trademark infringement is that this was through website sales, and we put in record the top-line revenue generated from the website. That is the burden that Cozy Comfort had in establishing damages. It was incumbent then on Top Brand to show what needed to be subtracted out, and the jury found a factual dispute and evaluated credibility to determine the damage number that they came up with. Thank you. Unless the Court has any questions for me, I think we're content to rest on our argument already given. Thank you.